OPINION OF THE COURT
Richard A. Dollinger, J.
Is old law still good law? In that regard, can a contractual obligation to pay maintenance be enforced if the former wife (receiving the maintenance) has now remarried and the parties’ “opting out” agreement does not contain a cutoff upon remarriage?
The answer to these inquiries carries the court into an interaction between negotiated contractual rights in “opting out” agreements and the dictates of the seldom-cited, and all but ignored, first sentence in section 248 of the Domestic Relations Law, mandating that courts must not enforce any orders which require a spouse to pay maintenance after the payee remarries, and section 236 of the Domestic Relations Law which provides for the termination of any order of maintenance “upon the death of either party or upon the [recipient’s] valid or invalid marriage.” (Domestic Relations Law § 236 [B] [1] [a]; [6] [f] [3].)
In this instance, a couple negotiated a separation agreement which provided for payment of maintenance by the husband on a sliding scale. As his children aged out of child support, his contribution for maintenance also declined. The maintenance was to be paid until November 2020. The agreement did not include any of the usual termination events—death of either spouse or remarriage of the recipient. The agreement uses the word “rehabilitative” as an adjective to the word “maintenance.”[1] With this agreement as a backdrop, the wife remarried in December 2015. In April 2016, the husband stopped paying maintenance. In response, the former wife filed an or *866 der to show cause, seeking to hold the husband in contempt, and a money judgment for the unpaid maintenance and attorney’s fees.
The husband’s argument is simple: in the absence of an agreement, maintenance ordered in a judgment of divorce terminates upon the wife’s remarriage. The wife argues that the agreement at issue here is an “opting out” agreement, and therefore the couple chose to define maintenance obligations outside the ambit of the Domestic Relations Law. Under these circumstances, the wife argues that when an “opting out” agreement is silent on the cutoff of maintenance, the court can delve into the parties’ intentions to determine whether there was an implicit promise that maintenance would continue until the end of the term set forth in the agreement.
The husband relies on statute to rebut the wife’s claims. The first sentence of section 248 of the Domestic Relations Law provides:
“Where an action for divorce or for annulment or for a declaration of the nullity of a void marriage is brought by a spouse, and a final judgment of divorce or a final judgment annulling the marriage or declaring its nullity has been rendered, the court, by order upon the application of the payor on notice, and on proof of the marriage of the payee after such final judgment, must modify such final judgment and any orders made with respect thereto by annulling the provisions of such final judgment or orders, or of both, directing payments of money for the support of the payee.”
In addition, the husband notes that the “termination upon remarriage” language is echoed twice in section 236 (B) of the same statute. Domestic Relations Law § 236 (B) (1) (a) states that an award of maintenance shall terminate “upon the payee’s valid or invalid marriage.” Later, in the same section, the legislature wrote the same command: “post-divorce maintenance shall terminate upon the . . . payee’s . . . marriage.” (Domestic Relations Law § 236 [B] [6] [f| [3].)
The wife suggests that the Court of Appeals decision in Cohen v Cronin (39 NY2d 42 [1976]) is the backdrop for a continuing maintenance obligation. In that case, the question was whether maintenance should be paid after the death of the payor. The Court held that the notion of payments of maintenance after death of the payor was a “well-accepted proposition,” citing Wilson v Hinman (182 NY 408 [1905]). In the lat *867 ter case, the Court of Appeals, more than a century ago, held that the parties could enter into an agreement that could bind the husband’s estate. But, the Court in Wilson v Hinman carefully added, “[a]n agreement of that character would in no way contravene public policy, and the performance of it would, doubtless, be enforceable by the courts.” (Id. at 414.) In short, at the dawn of the twentieth century, the Court of Appeals drew a line in the marital sand: a couple could extend maintenance beyond the “well-accepted proposition” of death, but not to “contravene public policy.” (Id. at 414.) Applying that principle 70 years later in Cohen v Cronin, the Court of Appeals held that the express language in the agreement—“until [the wife] shall remarry or expire” without any limiting language—obligated the husband’s estate to make maintenance payments. The Court in Cohen v Cronin applied the “well-established proposition” that maintenance can be paid after death of the payor. There was no public policy barring the payment of maintenance after the husband’s death, and therefore, the couple could agree to extend maintenance beyond that time.
The wife’s citation to Cohen v Cronin ignores the intervening Court of Appeals cases that did invoke a “public policy” exception to payment of maintenance. In the wake of Wilson v Hin-man, the Court of Appeals waited to be asked whether some public policy impacted the obligation to pay maintenance. It did not have to wait long or look far. Fourteen years later, in Schley v Andrews (225 NY 110 [1919]), the Court highlighted section 1771 of the Code of Civil Procedure as meeting the public policy test:
“If the defendant had obtained a divorce in this state, and the judgment had awarded her $200 per month alimony, and she had again married, as she has here done, and the plaintiff had made a motion to be relieved from such payment, the court would have had to grant the motion. The statute so provides (Code Civil Procedure, sec. 1771), and while this statute has no direct bearing on the question being considered, it indicates by its enactment a legislative intent that as a matter of public policy a wife who has a husband with whom she is living should be supported by him and not by one from whom she has been divorced.” (Id. at 114-115.)
During the next 14 years, lower courts agreed. In Dumproff v Dumproff (138 Misc 298 [Sup Ct, NY County 1930]), the court reaffirmed the underlying public policy inherent in the statute:
*868 “Upon her remarriage I hold that eo instanti the obligation to compel provision for her maintenance is shifted from the shoulders of her former spouse to him who assumes all the privileges, and, therefore, is ordinately a full measure of the duties incident to the marital state. This is as it should be. For otherwise, in a possible case ad interim the time of such remarriage and the application by the former husband for a modification of the final decree, the alimony paid by such former husband would not only lighten the duty of the second spouse in respect to the support of his wife, but might even be reflected, if the wife were a mere conduit, in the enhanced financial circumstances of such second husband. There could be no justice in such proposition.” (Id. at 299.)
In 1933, the Court of Appeals reaffirmed the public policy incorporated into section 1159 of the Civil Practice Act when applied to a separation agreement incorporated into a judgment of divorce, and struck down the decretal paragraph in the judgment requiring maintenance after remarriage. (Severance v Severance, 235 App Div 799 [2d Dept 1932], mod on other grounds 260 NY 432 [1933].) In the underlying decision, the Second Department stated that section 1159 was “mandatory” and a cutoff of maintenance was required upon “the conceded fact that the plaintiff had remarried” even if the obligation was set forth in an agreement between the husband and wife. (235 App Div at 799.) Four years later the Court revisited the question, this time under the revised section 1159 of the Civil Practice Act and the precursor of section 248 of the Domestic Relations Law.[2] The Court of Appeals, in Kirkbride v Van Note (275 NY 244 [1937]), quoted Schley v Andrews (225 NY 110, 114 [1919]) and specifically directed:
“The provision of the Civil Practice Act is mandatory. Where a former wife has remarried and an application is made for modification of the judgment with respect to the direction of payment of money for the support of the former wife, the court ‘must modify,’ and cannot in its discretion refuse to do so . . . The law recognizes the unfairness of *869 requiring a husband to pay alimony for a period during which his former wife is married to another. In view of the mandatory character of this provision and the public policy behind it, there can be no doubt that the right to apply for modification is not personal to the husband, and . . . [t]he modification is not limited to the time subsequent to the application. It applies nunc pro tunc as of the time of the remarriage to all unpaid alimony. To hold otherwise would enable a woman to conceal her remarriage and thereby obtain alimony from her former husband while she is living with a new spouse.” (Kirkbride v Van Note, 275 NY at 249.)
By 1948, the issue was considered resolved. In Goodman v Goodman (82 NYS2d 318 [Sup Ct, NY County 1948]), the court held that discontinuing maintenance upon remarriage applied to all forms of marital resolution, including separation decrees:
“But the public policy underlying the statute is that a wife who has a husband with whom she is living should be supported by him and not by a man from whom she has been divorced; and that policy applies with as much force where divorce and remarriage have followed a decree of separation as where remarriage has followed a decree of divorce or annulment.” (Id. at 321 [citations omitted].)
Succeeding courts reaffirmed the principle. In Reichel v Sollazzo (38 Misc 2d 217 [Sup Ct, Nassau County 1963]), the court held that the existence of the maintenance obligation in a separation agreement does not change the rule. (See also Grossman v Merke-Grossman, 248 AD2d 670 [2d Dept 1998] [remarriage terminates the maintenance obligation]; Jacobs v Patterson, 143 AD2d 397 [2d Dept 1988] [alimony terminates upon remarriage of the spouse]; Heinecke v Heinecke, 121 AD2d 363 [2d Dept 1986] [upon remarriage, obligation to pay support ended], citing Domestic Relations Law § 248; Canfield v Canfield, 55 AD2d 694 [3d Dept 1976] [incorporated separation agreement required payment of maintenance, but upon remarriage, decretal provision enforcing that agreement annulled], citing Domestic Relations Law § 248.)
Section 248, as the legislature’s declaration of public policy, is long standing. There is no evidence that the legislature has, in the intervening 80 years since its enactment, abandoned that view. In fact, despite numerous and extensive amendments to the Domestic Relations Law, the legislature has either implemented—or left in place—the two other references to *870 maintenance terminating upon remarriage. (Domestic Relations Law § 236 [B] [1] [a]; [6] [f] [3].) If the phrase “third time’s a charm” has any meaning, an unimpeachable proposition emerges: the public policy of New York, articulated by the Domestic Relations Law, does not permit maintenance to be paid after remarriage of the recipient spouse.
The wife argues that the opting out agreement in this instance negates that public policy. Domestic Relations Law § 236 (B) (3) provides that such “[a]n agreement by the parties, made before or during the marriage, shall be valid and enforceable in a matrimonial action if such agreement is in writing, subscribed by the parties, and acknowledged or proven in the manner required to entitle a deed to be recorded.” (Matisoff v Dobi, 90 NY2d 127, 132 [1997].) The statute thus permits parties to either “expressly waive or opt out of the statutory scheme governing equitable distribution.” (Wolanin v Wolanin, 39 Misc 3d 1222[A], 2013 NY Slip Op 50691 [U], *2 [Sup Ct, Albany County 2013].) Before considering the case law which the wife cites in support of this proposition, a brief review of the agreement is required. The title page of the agreement states “SEPARATION AND PROPERTY SETTLEMENT AND ‘OPTING OUT’ AGREEMENT.” The same language follows on the first page of the agreement, except the words “New York State Domestic Relations Law § 236 (B) (3)” precede the words “opting out agreement.” The words “opting out” are never repeated in the agreement. The agreement contains, in its prefatory language, reference to Domestic Relations Law § 236 (B) (5) (d) (equitable distribution), Domestic Relations Law § 236 (B) (6) (a) (maintenance), Domestic Relations Law § 240 (1-b) (f),[3] Domestic Relations Law § 236 (B) (8) (a)[4] and Domestic Relations Law § 240 (1-b). Each one of these sections involves discrete portions of the Domestic Relations Law, and the agreement states that the “parties have taken each of these sections into consideration and each of them warrants and represents to the other” that they have done so. The agreement then recites the exact terms of the five enumerated sections of the Domestic Relations Law. Each one of the sections enumerated are the basis for calculations for equitable distribution, maintenance, child support, health care and life insurance. The first three sections repeated the various equitable factors that courts must consider when awarding equitable distribu *871 tion, maintenance and child support.[5] The last two sections do not involve calculations, but refer to the couple’s obligations to carry health and life insurance for the benefit of their children.
In evaluating the terms of the agreement and their impact on this court, the agreement’s reference to Domestic Relations Law § 236 (B) (3) on the first page of the agreement is irrelevant to the court’s analysis. The section of the Domestic Relations Law referenced merely states that any agreement, if it complies with its provisions, shall be valid and enforceable. (Domestic Relations Law § 236 [B] [3].) Subdivision (3) of that section makes no reference to the termination of maintenance. The rationale for the recitation of these sections of the Domestic Relations Law is obviously based on pertinent case law, in place at the time of the execution of this 2007 agreement: agreements opting out of the basic child support obligations under the Child Support Standards Act (CSSA), but not containing the recitals of the pertinent statutory provisions and the presumptive calculations pursuant thereto have been found to be invalid. (See Anonymous v Anonymous, 142 AD3d 187 [1st Dept 2016]; David v Cruz, 103 AD3d 494 [1st Dept 2013].) This rule, regarding the requirement for a specification of the portions of the Domestic Relations Law from which a couple may opt out, has been a bedrock principle of opting out agreements since before this agreement was executed in 2007. (See e.g. Calian v Calian, 28 AD3d 506 [2d Dept 2006]; Warnecke v Warnecke, 12 AD3d 502 [2d Dept 2004].) Viewed from this perspective, this agreement uses the phrase “opting out” as a declaration that the couple understood their rights and obligations under the child support, maintenance and health care provisions in Domestic Relations Law § 236 (B) (the provisions specified in the agreement), but had nonetheless fashioned their own determinations regarding the application of those specified sections to their agreement.
What is not specified in the putative opting out language in the agreement is Domestic Relations Law § 236 (B) (1) (a), or Domestic Relations Law § 236 (B) (6) (f) (3), both of which, as noted earlier, require termination of maintenance upon remarriage. The agreement contains some language from which a reader might infer that the couple had taken these sections into account. The agreement states that the couple have taken into account “most if not all of the factors set forth in New York *872 Domestic Relations Law § 236, Part B.” The text of the agreement adds, in parenthesis, after the words “Part B,” that “all references hereto are delineated as DRL § 236B, etc.” But, any reading of the agreement that the couple intended to include the entire Domestic Relations Law or, for that matter, any sections other than of those written into the text of the agreement is unwarranted. The use of the phrase “all references hereto” indicates that the couple was solely referencing the sections of the Domestic Relations Law cited in the agreement. There is no language which states, unequivocally, that this couple was opting out of all the provisions of the Domestic Relations Law.[6] The language of the agreement unambiguously suggests that the couple never intended to opt out of the entire section 236 (B) of the statute and, by specifying the exact sections (and including their text in the agreement), the inescapable and unambiguous conclusion is that this couple only opted out of the cited provisions and nothing else.
Entirely absent in the opting out section is any suggestion or reference to any rights held by either party under section 248 of the Domestic Relations Law. While this couple specifically opted out of the application of the demarcated sections of the Domestic Relations Law, there is no portion of the agreement that specifies or relates to section 248. Under the theory of opting out endorsed by the New York courts regarding child support, the only applicable statutory sections to which the opting out language can apply are those specified in the agreement. The whole logic of requiring the specification of the sections to which the opting out will apply is that the parties will understand exactly what protections or rights—extended to them by the legislature under the pertinent statutes—will be forfeited or changed by the terms of their agreement. New York courts have recognized that the legislature gave divorcing couples the right to know exactly what rights they are extended *873 by statute before they voluntarily agree to modify or deviate from those rights. The Second Department documented this requirement, in the context of child support, in Rockitter v Rockitter (113 AD3d 745 [2d Dept 2014] [parties to a separation agreement are free to “opt out” of the provisions of the CSSA so long as their decision is made knowingly]; see also Colucci v Colucci, 54 AD3d 710, 712 [2d Dept 2008] [enforcing an agreement only if a party “knowingly opted-out of (CSSA) provisions” (internal quotation marks omitted)]). The Second Department also held that couples could opt out of virtually any portion of the Domestic Relations Law, but the waiver must be clearly evidenced by the writing. (Tietjen v Tietjen, 48 AD3d 789 [2d Dept 2008].) The whole purpose of requiring a specific detailing of the opted out sections of the Domestic Relations Law is to avoid the very circumstances present here, when one party, by invoking an amorphous opting out clause, seeks to have that phrase transmuted into a wholesale waiver of the opposite party’s undisclosed statutory rights under the Domestic Relations Law. The wife, in this instance, asks this court to interpret the words “opting out”—stated only in prefatory language of the agreement and found nowhere in its text—as a waiver of unarticulated rights found in unreferenced sections of the Domestic Relations Law. The court, if it followed this path, would venture into the exact “intention of the parties” quagmire that the higher courts, by permitting opting out agreements to constitute a waiver of only specifically stated provisions of the Domestic Relations Law, intended to avoid.[7]
Viewed under this legislative command, it is difficult to conceive that either party to this agreement opted out of the statutory rights created by section 248. There is no language in the agreement suggesting that either party was aware of their respective rights under section 248 or understood its potential consequences if the wife remarried. Conversely, there is no specific language that suggests that the husband surrendered his rights under section 248 simply when he opted out of applying the various cited Domestic Relations Law sections in the text of this agreement. In the absence of a specific reference to opting out applying to section 248, the statutory command—and the public policy behind it—suggests that the *874 husband retains his rights under that section. The Court of Appeals in another context affirmed this requirement that a “specific, affirmative expression” in an agreement is required to negate statutory rights to end maintenance. (Matter of Riconda, 90 NY2d 733, 737 [1997].) The Fourth Department articulated that exact principle well into the era of equitable distribution: “unless the agreement between the parties specifies that the support obligation is to survive the former spouse’s remarriage, such an obligation should not be assumed.” (Scibetta v Scibetta-Galluzzo, 134 AD2d 823, 824 [4th Dept 1987].) Finally, in Lorenz v Lorenz (63 AD3d 1361 [3d Dept 2009]), the Court, referencing a judicial determination on maintenance, added that any language referencing the remarriage cutoff was “unnecessary” in the judgment because the Domestic Relations Law, “in more than one place,” provides for the termination of any order of maintenance “upon the death of either party or upon the recipient’s valid or invalid marriage” (id. at 1364, citing Domestic Relations Law § 236 [B] [1] [a]; [6] [f] [3]).
To rescue her argument that the opting out language in this agreement extends to an opting out of the provisions of section 248, the wife offers a series of cases which discuss opting out agreements. The wife cites Sacks v Sacks (168 AD2d 733 [3d Dept 1990]), which references an “opting out agreement” and contains two propositions. First, the maintenance provisions of Domestic Relations Law § 236 (B) (6), which sets standards for court awarded maintenance, are expressly made inapplicable to opting out agreements. (Domestic Relations Law § 236 [B] [6] [a].) The Court then jumps to the conclusion that “an agreement requiring that maintenance shall continue after remarriage is not against public policy and is enforceable.” (Sacks at 734.) The Court jumps too far. The Court properly notes that the requirements of section 236 (B) (6), which describe how to calculate maintenance, may be expressly waived by a couple in an agreement, i.e., they may “opt out” of the statutory method. The Court simply said that the couple, provided that the statutory standards are disclosed, can choose to ignore the standards set forth in same section of the statute, a notion that this court confirms. But, nowhere does section 236 (B) (6) (a)—or the Third Department in Sacks v Sacks—suggest that the mere description of a separation agreement as an opting out agreement makes all provisions of the Domestic Relations Law inapplicable to such agreement. The Third Department decision, which the wife reads as broadly as possible, is best *875 read as allowing the parties to structure maintenance as they deem fit, but nowhere suggests that simply inserting the word “opting out” before the word “agreement” waives the public policy provisions of section 248. The Third Department in Sacks v Sacks never mentions section 248 of the Domestic Relations Law and apparently never considered section 248 as indicating a legislatively created public policy against maintenance payments to a remarried spouse.
The Fourth Department in Fredeen v Fredeen (154 AD2d 908 [4th Dept 1989]) reached the same conclusion a year earlier, holding that an opting out agreement could extend maintenance beyond remarriage, but that Court also never discussed section 248 or any of the Court of Appeals precedents that interpret the statutory term “must” as indicating a public policy barring the payment of maintenance to a remarried spouse. The Fourth Department recently reached the same conclusion—albeit again without reference to section 248 or the Court of Appeals precedents—in Hancher v Hancher (31 AD3d 1152 [4th Dept 2006]).
The Second Department reached the same conclusion by the same logic in Quaranta v Quaranta (212 AD2d 683 [2d Dept 1995]) and Matter of Benny v Benny (199 AD2d 384 [2d Dept 1993]). The First Department used the same logic in Burn v Burn (101 AD3d 488 [1st Dept 2012]), and while it mentions section 248, it never discusses the string of Court of Appeals decisions stating that the statute reflected a public policy against the payment of maintenance after remarriage. Instead, the First Department borrows the logic of Hancher v Hancher and deems post-remarriage maintenance enforceable unless the agreement states otherwise. In concluding that an opting out agreement could extend maintenance beyond remarriage, none of these decisions ever discussed the Court of Appeals decisions under section 248 and/or the strong public policy against requiring the payment of maintenance after marriage of the recipient spouse. In addition, none of these courts explored the exact meaning of the phrase “opting out” or considered whether the mere invocation of that term constituted a waiver of either partner’s rights under unspecified portions of the Domestic Relations Law, including section 248.
This court faces a dilemma: follow the wisdom of all four Appellate Divisions and hold that the agreement, if interpreted consistent with its terms, permits post-remarriage maintenance or, in the alternative, hold a hearing to determine the *876 parties’ respective intentions and the “meaning” of the agreement,[8] or follow the Court of Appeals mandate that section 248 and legislative derivatives in section 236 (B) bar payment of maintenance to a remarried spouse. The choice is simple: the state legislature sets the public policy of this state. Section 248 states that this court must annul any order or judgment that provides for payment of maintenance to a party who remarries. The rule of section 248, enacted almost a century ago in other parts of New York statutes, remains the law and public policy of this state. The legislature, in section 236 (B), twice repeats that direction. The Court of Appeals for three quarters of a century has remained steadfast by declaring that paying maintenance to a party who has remarried violates that legislative command. In all of those cases, divorce agreements required payments after remarriage and, in those same cases, the Court voided the agreement and vindicated the statute. The Court of Appeals has never changed its mind. Neither has the legislature, despite making voluminous changes to the Domestic Relations Law in the last half century. This court cannot change that command.
Furthermore, because of the strong public policy inherent in section 248, this court declines to interpret the words “opting out”—used solely as prefatory language in this agreement, and never defined in the agreement or specifically referencing Domestic Relations Law § 248 as the New York courts have required when enforcing opting out agreements—to reach the conclusion that the husband in this matter, by signing this agreement, waived his rights under section 248. (See Momberger v Momberger, 103 AD3d 971 [3d Dept 2013] [requiring express waiver of statutory right to claim attorney’s fees and party may otherwise obtain statutory fee assessment]; Davis v Welber, 278 App Div 36, 38 [1st Dept 1951] [the agreement must be construed in the light of the public policy of this state and “(i)n the absence of an express agreement, a woman situated like the plaintiff may not compel support by her former spouse while living with a second husband and receiving support from him”].) A literal reading of section 248 confirms *877 this conclusion. Applying its terms, it mandates that this court annul an order or judgment requiring that maintenance be paid after the recipient remarries. This statute prohibits this court from issuing an order enforcing the collection of maintenance and, therefore, even if the court held that the wife had a contractual claim to recover maintenance, the court cannot issue an order or judgment against the payor for maintenance paid after the wife remarried.
The maintenance provisions of this agreement that would require payment of maintenance after the recipient spouse’s remarriage violate the public policy of New York and the agreement cannot be read to suggest that the husband waived his right to insist that that policy be followed. The legislature has said that maintenance ends when the recipient remarries and this court must annul any requirement to pay such maintenance. In this case, “must”—when spoken by the legislature and echoed by the Court of Appeals on matters related to domestic relations—means “must.”[9]
The wife’s application for an order enforcing the maintenance requirements beyond the date of her remarriage is denied. Her application is dismissed.

. In oral argument of this application, the court pressed both parties on whether the word “rehabilitative” created a more pertinent and enforceable obligation than just the word “maintenance.” Based on the court’s decision, that issue is moot.

. Section 1159 of the Civil Practice Act then contained the same language as the first sentence of the current Domestic Relations Law § 248, directing that upon proof of marriage after such final judgment, a court must annul the provisions of a divorce decree, final judgment, or orders “directing payments of money for the support of the plaintiff.”

. This section of the Domestic Relations Law relates to child support.

. This section of the Domestic Relations Law relates to health insurance.

. The couple attached the exact language of the Domestic Relations Law used to calculate child support in a separate appendix.

. The wife’s own application belies any suggestion that she intended to opt out of all of the provisions of the Domestic Relations Law. In her application, she seeks attorney’s fees pursuant to sections 237 and 238 of the statute, even though the agreement states that neither party can collect fees for the divorce action. She apparently wants it both ways: she claims that the couple, by signing this agreement, opted out of section 248, but did not “opt out” of section 237 (a) or 238, even though neither portion of the statute is mentioned. There is no evidence she—or her ex-husband—specifically or expressly “opted out” of their postjudgment rights under section 237 (a) or 238 and the same quantum of evidence supports the conclusion that the husband “opted out” of his postjudgment rights under section 248 or its corollaries in section 236.

. The husband, in his brief before the court, argues that the agreement reflects an intention that maintenance would not survive remarriage. This court declines to comment on this argument as, in view of the court’s determination, it is superfluous.

. To reach this conclusion, this court would, presumably, have to conclude that the agreement is ambiguous and hence, parole evidence of the parties’ intentions would shed light on its intended meaning. (Marin v Constitution Realty, LLC, 28 NY3d 666 [2017]; Blue Jeans U.S.A. v Basciano, 286 AD2d 274 [1st Dept 2001].) But, the exercise would ignore one undisputed fact: the agreement nowhere references section 248 and never discusses its implications on the parties’ rights.

. Based on an electronic search, Domestic Relations Law § 236 uses the word “must” only twice. Both instances are in the child support provisions in part (B) (7) and (9) and that command dictates that any request for a child support award must include a referral to the pertinent Child Support Enforcement Unit (CSEU) or a statement that the recipient knows of services provided by that agency. Sections 237 and 238, which provide for awards of attorney’s fees, do not use the term. In section 240 (1) (a), the legislature said courts “must consider the effect of such domestic violence upon the best interests of the child” and added that courts “must determine custody or visitation in accordance with the terms of this section.” The legislature in section 240 also repeated the command, made in section 236, that the referral to CSEU “must” be contained in child support orders. The sparing use of the word “must” in these vital sections of the Domestic Relations Law underlines the importance of its use in section 248. While the remainder of the Domestic Relations Law, in describing a court’s role in marital relations, is loaded with the words “may” and “discretion,” section 248’s use of the term strongly suggests that the legislature left this court with no “discretion” in annulling the maintenance requirement in this agreement.